## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ROBERT COOPER, #209556                      *

                                                              *

Plaintiff,                                  *       Civil Action No.  JFM-13-3872

                                                              *

v                                           *

                                                              *

RODERICK SOWERS,                            *
J. MICHAEL STOUFFER, Commissioner of        *
  Correction,                               *
BOBBY P. SHEARIN, North Branch Corr.        *
  Institution,                              *
G.B. McALPINE,                              *
N.A. KLINK,                                 *
J.L. HARBAUGH,                              *
JOHN/JANE DOE, Director of the Chaplain's   *
  Office aka Stephanie Coates               *
KEVIN L. LAMP, the Chaplain's Office,       *
PARRISH KAMMULF, Dietary Manager,           *
MICHAEL GUTILLO,                            *
C. GILPIN,                                  *
J. PAYNE,                                   *
V. WHITEMAN,                                *
J.T. ZAIS,                                  *
OFFICER BAUER,                              *
C.P. ROBINSON,                              *
JAMES SMITH,                                *
D.L. SMITH,                                 *
JOHN/JANE DOES,                             *
MARY JO ROSE,                               *
P.H. PENNINGTON,                            *
FRANK B. BISHOP, JR. Warden of              *
  Western Correctional Institution,         *
RANDY WATSON,                               *
E. LAMBERT,                                 *
R. STOTLER,                                 *
D. BEACHY,                                  *
W.L. LEYDIG,                                *
RICHARD J. GRAHAM, JR.,                     *
JOHN/JANE DOE,                              *
L. MOULDIN, aka as Moulden,                 *
RANDY ADKINS,                               *
Y. YUTZY,                                   *
D. BITTINGER,                               *

D. BROADWATER,                                    *
OFFICER GOLDEN, aka Gonoas                        *
ROBERT MANUEL,                                    *
R. DOLLY,                                         *
V. WARNICK, aka as Warnyck,                       *
BRUCE LILLER, Psychology Dep't.,                  *
MR. BANKS, Psychology Dep't.,                     *
MS. HART,[1]                                      *
RONALD SHANE WEBER,                               *
KEITH ARNOLD,                                     *
J. SELLERS,                                       *
                                                  *
Defendants [2]                                    *
                                                ***

# MEMORANDUM

Pending is self-represented plaintiff Robert Cooper's ("Cooper") complaint filed pursuant

to 42 U.S.C. § 1983.  (ECF 1).  Counsel has filed a motion to dismiss or, in the alternative, a

motion for summary judgment  on behalf of Warden Frank B. Bishop, Jr.[3] former Warden Bobby

Shearin,[4] former Director of Corrections Roderick R. Sowers,[5] former Commissioner J. Michael

Stouffer,[6] Deputy  Commissioner  Randy  Watson,[7]  Warden  Richard  J.  Graham,  Jr.,[8]  Mental

---

[1]  Counsel indicates defendants last name is Tart, not Hart. (ECF 27 n. 17).

[2]   Service has not been obtained on Kathy Jacobs, V. Warnick, James Smith, John/Jane Doe aka Stephanie Coates, E. Lambert, or Mr. Banks.  (ECF 27-1 nn. 12-16).  The outcome of this matter would not be changed had service been obtained on them.  Kathy Jacobs, V. Warnick, James Smith, John/Jane Doe aka Stephanie Coates, E. Lambert, and  Mr. Banks shall be dismissed.  Further, all John/Jane Doe defendants shall be dismissed.

[3] Bishop is presently warden at North Branch Correction ("NBCI"). The position of Director of Correction no longer exists. Sowers is no longer a state employee. (ECF 27- 1, nn. 1-8).

[4] Shearin is former warden of  NBCI.

[5]  The position of "Director of Corrections" no longer exists. (ECF 27-1 n. 3).  Sowers is no longer in the state employ.

[6] Stouffer has held the positions of Deputy Commissioner of Correction. Commissioner of Correction and Secretary of the Department of Public Safety and Correctional Services. (DPSCS).

[7]  Randal Watson is Director of Program Services (ECF 27-1, n. 5).

[8]  Graham is presently warden at Western Correctional Institution ("WCI").

Health Professional Counselor Supervisor Ronald Shane Weber,[9] Major Keith Arnold,[10] Captain Ronald Stotler, Lt. George McAlpine, Lt. Jason Harbaugh, Lt. Dale Smith, Lt. Robert Manual, Lt. Paul Pennington, Sgt. Vaughn Whiteman, CO II,[11] Michael Gutillo, CO II Ronnie Dolly, CO II Justin Sellers, CO II Brian Goldizen, CO II Ricky Bauer, CO II David Beachy, CO II Randy Adkins, CO II Cody Gilpin, CO II Jeremy Payne, CO II Nathan Klink, CO II William Leydig, CO II Don Broadwater, CO II Dorothy Bittinger,[12] CO II Timothy Yutzy, Correctional Case Management Specialist II David M. Bittinger, Mental Health Professional Counselor Bruce Liller, Mental Health Professional Counselor, Laura Booth (formerly Laura Moulden), Mental Health Professional Counselor Amanda Tart, Office Clerk II Mary Jane Rose, Correctional Dietary Manager Parrish Kammauf, Chaplain Kevin Lamp, Sgt. Jared Zais, and C.O. II Christopher Robinson. (ECF 27). [13]

---

[9]  Weber is a mental health provider at WCI.

[10]  Arnold, who is assigned to WCI, is former Chief of Security at NBCI. (ECF 27-1 n. 8).

[11]  Cooper presents no specific claims against M. Cady(who is not shown on the docket but named in the complaint), C.P. Robinson, V. Whiteman, or D.L Smith.  It does not appear that service was not obtained on M. Cady.

[12]  Bittinger is employed at WCI. (ECF 27-1 n. 9).

[13]   The Clerk shall amend the docket to reflect a full and accurate listing of defendants names asWarden Frank B. Bishop, Jr. former Warden Bobby Shearin, former Director of Corrections Roderick R. Sowers, former Commissioner J. Michael Stouffer,  Deputy Commissioner Randy Watson,  Warden Richard J. Graham, Jr.,  Mental Health Professional Counselor Supervisor Ronald Shane Weber,  Major Keith Arnold,  Captain Ronald Stotler, Lt. George McAlpine, Lt. Jason Harbaugh, Lt. Dale Smith, Lt. Robert Manual, Lt. Paul Pennington, Sgt. Vaughn Whiteman, CO II,  Michael Gutillo, CO II Ronnie Dolly, CO II Justin Sellers, CO II Brian Goldizen, CO II Ricky Bauer, CO II David Beachy, CO II Randy Adkins, CO II Cody Gilpin, CO II Jeremy Payne, CO II Nathan Klink, CO II William Leydig, CO II Don Broadwater, CO II Dorothy Bittinger, CO II Timothy Yutzy, Correctional Case Management Specialist II David M. Bittinger, Mental Health Professional Counselor Bruce Liller, Mental Health Professional Counselor, Laura Booth (formerly Laura Moulden), Mental Health Professional Counselor Amanda Tart, Office Clerk II Mary Jane Rose, Correctional Dietary Manager Parrish Kammauf, Chaplain Kevin Lamp, Sgt. Jared Zais, and C.O. II Christopher Robinson.

Cooper was provided an opportunity to file an opposition reply, with materials in support in accordance with the ruling *Roseboro v. Garrison*, 528 F.2d. 309 (4th Cir. 1975), and has filed an opposition. (ECF 31).[14]

After considering the pleadings, exhibits, and applicable law, the court finds a hearing is unnecessary, *see* Local Rule 105.6 (D. Md. 2014).  For reasons to follow, defendants' motion (ECF 27) will be DENIED in part and GRANTED in part.

## BACKGROUND

### I.    Plaintiff's Claims

Cooper, who is presently incarcerated at Western Correctional Institution ("WCI") filed this complaint on December 23, 2013.  The complaint consists of fifty-one handwritten pages and names more than forty defendants, including John and Jane Does, and employs a "kitchen sink" approach to claim filing. He raises a plethora of claims concerning alleged multiple incidents occurring at WCI and North Branch Correctional Institution ("NBCI"). Cooper's complaint is divided into eight claims.

In Claim One, Cooper alleges his access to the Administrative Remedy Process (ARP) was improperly "limited."  Cooper claims defendants  Bishop, Watson, and Graham "limited" his use of the Administrative Remedy Process (ARP).  (ECF 1-1, pp. 10-11).  Cooper alleges that on September 9, 2010 and December 21, 2011, the Warden and Commissioner "limited" his access to the ARP process, and that between January 1, 2010 and January 1, 2013, Sgt. Zais abused his authority relative to the ARP process. *Id*.  Cooper asserts that his access to the ARP process was limited on November 20, 2012 at WCI by Warden Bishop, Assistant Warden

---

[14] Cooper filed his complaint with a declaration of the veracity of his claims. (ECF 1, p. 51).  His generally stated denial in his opposition to defendants' dispositive motion is unsupported by verified exhibits or declarations.

Graham and Deputy Commissioner Watson. *Id*.  As relief he seeks damages and a preliminary injunction to cease restriction of his ARP filings.

In Claim Two, Cooper claims defendants failed to protect him from harm. He claims he was assaulted by inmate Matthew Lewis on August 9, 2011. Cooper also states he was assaulted by inmate Calvin Beachy on January 31, 2012.  Cooper claims he was assaulted by inmates Jules Williams and inmate Donald White on August 4, 2013.   Cooper claims generally that correctional officers failed to protect him. He attributes his assaults to policies and decisions implemented by the Commissioner of Correction and WCI's Warden to double-cell inmates and to performing lock-in procedures without a correctional officer on the top and bottom tiers. (ECF 1-1, pp. 14-19). Cooper claims that defendants Beachy, Leydig, Harbaugh, and Stotler failed to use due care to protect him from harm at the hands of inmate Calvin Brawley. *Id*. at 16-18. As relief, Cooper seeks damages and injunctive relief to cease "the unsafe practice" of double celling of inmates on disciplinary and administrative segregation. *Id.* at 20.

In Claim Three, Cooper presents a claim of religious infringement.  He claims that that on December 7, 2011 NBCI defendants Stouffer, Shearin, Stephanie Coates, Chaplain Lamp and Dietary Manager Parish Kammulf failed to provide him with a meatless diet on Ash Wednesday and every Friday during Lent.  (ECF 1-1, pp. 23-26).  Cooper also alleges that on December 13, 2013, while housed at WCI, Stouffer, Coates, Bishop and "John/Jane Doe Dietary Manager at WCI" failed to provide a meatless diet on Ash Wednesday and every Friday during Lent. *Id*. As relief, he seeks damages and injunctive relief to cease failure to provide meatless meals during Lent.

In Claim Four, Cooper raises a claim of inadequate mental health treatment for his self-reported "battered person syndrome," post-traumatic stress disorder (PTSD), and paranoia from

being housed in a cell with other inmates.  He avers that: on or about April 27, 2010 and

December 21, 2011, Mouldin deprived him of treatment; on or about October 31, 2011, on

February 17, 2012, and March 19, 2012, Warnyck deprived him of treatment; on or about

January 6, 2012, Banks and Liller deprived him of treatment; and on or about August 12, 2013,

Weber deprived him of treatment. Lastly, he claims that between October 22, 2013, through

December 5, 2013, [15] Weber deprived him of treatment.  As relief, Cooper requests damages and

injunctive relief whereby defendants will cease depriving him of mental health treatment, a

mental health evaluation at the mental health unit in Jessup, Maryland, and placement on single

inmate cell status for psychological reasons.  (ECF 1-1, pp. 27-31).

In Claim Five, Cooper presents numerous and unrelated allegations arising from the time

he was housed at NBCI.  On April 9, 2011 and on July 24, 2011, Officer Sellers allegedly called

him a "child molester," and on November 30, 2011, called him a "good snitch" in the presence of

other officers and inmates.  Cooper claims in August of 2010, defendants Adkins and T. Yutzy

entered his cell with other unnamed officers and fondled his genital and buttocks, deprived him

of out-of-cell recreation on two occasions, and purposely left on his cell light.  Cooper claims

Adkins deprived him of a meal tray and improperly confiscated his personal property on August

30, 2010 and September 3, 2010, respectively.

Additionally, Cooper claims: 1) on April 9, 2011, defendants Bittinger, Broadwater,

"Gonaos" (Golden) and E. Lambert called him a child molester in front of other inmates; 2) on

May 4, 2011, defendant Manuel purposely left on Cooper's cell light and wrote a false report on

him; 3) on May 4, 2011, Sellers wrote a false report on him; 4) Adkins left on Cooper's cell light

after serving him with notice of a rule violation; 5) on May 7, 2011, Manuel ordered a urine test

---

[15]  Cooper presented substantially the same claim in Civil Action No. JFM-13-3692.  The claim was considered in that case, and summary judgment was entered in favor of defendants. According, this claim will be dismissed as repetitive.

for  Cooper to retaliate against and harass him; 6) on July 10, 2011, Adkins denied Cooper medical care and lab work by falsely reporting to medical staff that he refused to report for testing; 7) on July 31, 2011, Sellers "assaulted" plaintiff by "snatching a coffee cup from his hand," 8) on September 26, 2011 (and September 26, 2009), Dolly used profanity and threatening language toward him, 9) in November of  2011, Gilpin wrote a false report, used threatening language, and called him a "good snitch" in front of other inmates and officers; 10) on December 15, 2011, Payne wrote a false infraction in support of Gilpin's report; 11) on February 2, 2012, Gilpin harassed him by showing up at his cell to see his injuries after the altercation with inmate Calvin Brawley on January 31, 2012; and 12) on February 13, 2012, Lt. Harbaugh and E. Lambert physically forced plaintiff into an unsafe environment when they placed him in a double cell after Cooper  refused to be double-celling. (ECF 1-1, pp. 32-38).  As relief, Cooper requests damages and injunctive relief to secure the transfer of the above named correctional officers to another institution.[16]

In Claim Six, Cooper states Andre Antonio, his "life partner," hung himself at NBCI sometime between September 13, 2013 and September 23, 2013.  Cooper contends members of the psychology department and correctional staff were responsible. As relief, Cooper seeks damages, including damages for pain, suffering, and emotional distress.  (ECF 1-1, pp. 42-44).

In Claim Seven, Cooper presents claims concerning his mail at NBCI. Cooper alleges that between July 6 and August 3, 2011, he learned that his outgoing legal correspondence placed in the institutional mailbox was not reaching its destination.  Cooper states that between 2010 and the date he filed this federal complaint, his outgoing legal mail was not reaching its destination and he was not receiving some of his incoming legal and personal mail.  Cooper posits that Shearin, mailroom supervisors Kathy Jacobs and Mary Jane Rose, and Sgt. Zais were

---

[16]  To the extent Cooper has been transferred from NBCI to WCI, his claims for injunctive relief are arguably moot.

involved in the disappearance of his mail. As relief, he requests damages and injunctive relief to order case management to collect all his mail each day, register it in a logbook, and take his mail directly to the mailroom at North Branch. (ECF 1-1, pp. 45-48).

In Claim Eight, Cooper assert that on May 1, 2012, while he was housed at NBCI, Lt. Pennington and Security Chief Arnold placed him on administrative segregation for exercising his right to free speech and to practice his religion. Cooper provides no details in support. (ECF 1-1, p 49).  Notably he does not explain in what way his right to free speech and to practice his religion was implicated or how his speech or religious practice caused his placement on administrative segregation. As relief, he asks for damages and injunctive relief.

## II.    Defendants' Response

Defendants' exhibits in support of their dispositive motion include a copy of Cooper's ARP log, internal investigation unit ("IIU") reports, copies of his psychological records, the hearing examiner's review of his rule violation, and declarations.

Regarding Cooper's claim concerning submission of ARPs, Jared Zais, ARP coordinator at NBCI, attests in his declaration that he has searched the records of NBCI's ARP Office and will "testify that this office has acknowledged and processed all of the Administrative Remedy Procedures from Robert Cooper.. (ECF 27-4).  Zais attests that to his knowledge at no time were Cooper's ARP requests withheld, delayed, or left unprocessed when they were in compliance with policies and directives of the Department of Public Safety and Correctional Services ("DPSCS").[17]

Scott S. Oakley, Executive Director of the Inmate Grievance Office ("IGO"), attests in his declaration that Cooper filed IGO No. 20131911 October 31, 2013, as an "appeal" from the

---

[17]   Cooper is a prolific filer of ARP requests.  Since March 16, 2007, Cooper has filed 359 ARPs. (ECF 27-4; *see also* ECF 27-5).

disposition of ARP-WCI-1433-13, an ARP in which inmate Cooper complained WCI staff failed to protect him from an attack by inmates on August 4, 2013. (ECF 27-5, 27-6).[18]  The grievance was administratively dismissed on December 16, 2013, based on Cooper's failure to properly exhaust the ARP process. *Id.* There is no record Cooper sought judicial review of that determination.[19]

In his declaration, NBCI correctional case manager Randy Durst attests there are no Use of Force (UOF) or Serious Incident Report (SIR) records regarding an alleged assault against Cooper on August 9, 2011. (ECF 27-7).  However, medical records from August 9, 2011 indicate Cooper went to the medical unit that day for a puncture wound to his hand, and told medical providers he was in a fight with his cell mate.  The medical record reveals the area was cleaned with soap and water and a Band-Aid was applied. (ECF 27-8).

On January 31, 2012, Cooper was involved in an altercation with his cellmate Calvin Brawley, and filed an ARP asking to press charges against him. (ECF 27-9).  Detective Sergeant Raymond Wills was assigned to conduct an IIU inquiry. Wills' investigation included reviewing the report completed by Officer David Beachy after the incident and interviewing Cooper. Brawley refused to discuss the incident with Wills.  Beachy's report of the incident reads that he heard "banging" on the cell door and upon investigation, he witnessed Cooper and Brawley standing apart from each other. Brawley, who was standing closest to the door, demanded that Beachy remove Cooper from the cell.  Beachy reported Cooper was bleeding from the facial area and escorted him to the medical unit where he was evaluated and photographed.

---

[18]  Cooper filed three other IGO grievances, none of which is pertinent to the claims in this case.

[19]  Judicial review of the decision is not apparent upon review of the electronic docket. *See* http://casesearch.courts.state. md.us/ casesearch/inquirySearch.jis.

Cooper's medical record from that day shows he reported being hit in the face by his cellmate. The medical record states he complained of pain in the right mandibular region. Lacerations to his eyebrow, lower eyelid, and mid upper lip and a lump on his cheek were noted. The wounds were "cleaned and glued." (ECF 27-9, pp. 17-21). The record shows x-rays and pain medications were ordered. *Id.*

The altercation was not recorded and there were no other witnesses. Cooper and Beachy were issued infraction notices for fighting. Cooper was found not guilty, and Brawley was found guilty of a rule violation and received 300 days of disciplinary segregation and lost 120 diminution credits. *Id.* at pp. 6-7, 12. The IIU case was closed based on lack of evidence and a determination by the Office of the State's Attorney for Allegany County that the case lacked prosecutorial merit. *Id.* at pp. 6-7.

A separate IIU investigation was conducted after Cooper was involved in an altercation with inmate Jules Williams on August 4, 2013. The IIU investigation was initiated after. Cooper wrote three letters asking to file criminal charges against Williams and a second inmate, Donald White. *Id.* at 7 and 15-25. Detective Sergeant Mark J. Forrest was assigned to conduct the investigation. (ECF 27-10).

Forrest reviewed the incident reports, medical reports, and interviewed Cooper. Cooper told the IIU investigator that he was attacked in his cell by Williams, and assaulted later by inmate White during "lock-in." *Id.* Cooper said when the cell door opened for cell count that evening, White came across the tier and he and Williams together attacked Cooper. White ran out the cell when the cell door began to close and the attack stopped. Cooper said that he was stabbed with a pencil by Williams after Cooper told him he was going to tell a correctional officer that he needed medical attention. *Id.* at 9. Cooper told the IIU investigator that he had

argued with Williams earlier in the day about the television volume, the cell window being left open, and inmate Williams moving the bunk around in their cell. *Id*.

Officer Brittny [sic] Riley was conducting an inmate count and discovered Cooper and Williams exchanging blows. *Id*. at 8. Cooper and Williams refused to obey her direct orders to cease fighting and pepper spray was administered. *Id*.[20] The fighting stopped and the inmates were taken for medical evaluation. There were no other witnesses prior to Riley's arrival. *Id*. at 7.

Cooper and Williams were treated for pepper spray exposure in the medical unit. Cooper was transported to the Western Maryland Regional Medical Center for an x-ray for a suspected fractured jaw; however, the x-ray was negative and plaintiff was returned to WCI. *Id* at 7, 80, 83-98. Cooper told the IIU investigator that he was housed in the WCI infirmary for the next four days. *Id.*

Williams was charged and found guilty of violating inmate rules # 102 and 104 (assault or battery on an inmate and disobeying a direct order) and sanctioned with thirty days of segregation and loss of 30 days of good conduct time. Cooper was charged and found guilty of violating Rules # 102 and 104. He was given 180 days of segregation and lost 120 days of good conduct credit. *Id*. at 8. White was not charged with violating inmate rules. *Id* at 10.

The IIU investigator spoke to Allegany County Assistant State's Attorney Eric Bean who advised that he wanted to present the case to a grand jury in Allegany County, and charge both

---

[20]   The use of pepper spray to quell the altercation is not at issue in this case. A videotape of the incident was reviewed by the Captain G.W. Garlitz who concluded it showed the staff response but did not document the incident. (ECF 27-10, pp. 61, 63). The IIU report does not indicate that the videotape was reviewed. The videotape was not provided to the court.

Williams and White with assault. Bean requested a copy of the report after the IIU investigation was completed. *Id.* at 10-11. [21]

The "lock-in" procedure is explained by Lieutenant Robert Carder in his declaration During "lock-in" an officer is stationed on the bottom tier to observe the inmates on that level. (ECF 27-11). A second officer is located in the security control center and has a clear, unobstructed view of the entire second level of the tier.  Carder attests   WCI is a double cell institution and every inmate housed at WCI is double celled unless a court order exists directing otherwise or, if the inmate has medical documentation indicating a need for single cell status. *Id.*

Regarding Cooper's religious practice claims, the record shows he is registered as a Roman Catholic (ECF 27-12). Division of Correction ("DOC) policies and procedures governing the efforts to accommodate the First Amendment rights of inmates are outlined in the DOC Religious Services Manual, which recognizes that Catholics abstain from eating meat on Ash Wednesday and on all Fridays between Ash Wednesday and Good Friday as an observance of the Lenten season. (ECF 27-13).  The manual states individuals make personal decisions regarding from what food they will abstain. No special meal requirements or adjustments are provided for Lent because it is up to the inmate to decide whether to eat only non-meat items, - it is not a requirement. *Id.* at 12 and 16. [22]

Cooper's psychological records show that during a behavioral health segregation visit on August 12, 2013, he reported to Nurse Stratton Brown that he was on a hunger strike, and claimed that he was only taking sips of water with his medication. (ECF 27-15).  Stratton Brown

---

[21]   Jules Williams was charged with second-degree assault in case number 01K14015767 in an indictment filed in the Circuit Court for Allegany County. The case was dismissed nolle prosequi on August 19, 2014. *See* http://casesearch.courts.state.md.us/casesearch/inquiryDetail.jis?caseId=01K14015767&loc=57&detailLoc=K.    N Review of the electronic docket does not indicate charges were brought against Donald White.

[22]  In 2011, Lent began on Wednesday, March 9, 2011, and in 2013, Lent began on Wednesday, February 13, 2013. (ECF 27-14).

noted that although Cooper reported that he had not accepted a food tray since the previous Friday, custody staff indicated that he had accepted meal trays.  Stratton Brown reported that Cooper was "demanding" and on August 4, 2013, when she counseled him on better problem solving tactics, he was unreceptive. *Id*. at 2.  Stratton Brown notified the psychology and medical departments concerning Cooper's hunger strike, and he was monitored for the next several days. *Id.* at pp. 2-12.

On August 16, 2013, Cooper was seen in the medical unit for weight loss due to his hunger strike.  He reported he was taking all his medications with liquids, and stated "I am willing to die if I have to because they are not taking care of my safety, property, health and other issues."  *Id*. at 11.  Cooper was counseled that it was not in his best interest to refuse to eat, a nutritional supplement was ordered, and he was advised to increase oral hydration. Cooper continued to be monitored by medical staff. *Id*. at 16-23.

The same day, August 16, 2013, Cooper met with Weber, a member of the psychology department.  *Id*. at  13-15.  Weber's comments in the chart read:

> Met with Cooper to follow up on a self-referral to the Psychology Department and multiple staff referrals. Sgt. Merling HU 4 Sgt. attended the meeting to address the custody related issues.  Inmate Cooper reports multiple stressors associated with being incarcerated. Specifically, he reports fear for safety as he was assaulted by two individuals while in GP [general population], property issues, and the infraction process.  Discussed appropriate ways to cope with stress and seek interventions.  Inmate acknowledged, and he denies any active thoughts of harm toward others.  Inmate presents as demanding, oppositional, and narcissistic. Sgt. Merling will address the custody issues accordingly (i.e. property, enemy situation, etc.).

*Id*. at 14.  Weber concluded Cooper did not express homicidal or suicidal ideations, and referral to a psychiatrist was not necessary at that time. *Id*.  Weber recommended Cooper remain in his current housing status and follow up with him as necessary. *Id*. at 14-15. Additionally, Weber recommended treatment to reduce the risk of Cooper needing a more intensive level of care and

to maintain or improve his current functioning. *Id.*[23] Weber recommended therapeutic interventions with problem solving, cognitive behavioral management, and positive reinforcement for appropriate behavior. *Id.*

On August 21, 2013, Cooper was moved from Housing Unit (H.U. #4), the Segregation Unit, to Special Observation Housing (SOH). *Id.* at pp. 25-27.[24]  It was noted that he was taking fluids with his medications, and he was provided 240 ml. of "Boost," a nutritional supplement. *Id.* at 26.   That same day, Cooper met with Weber for "crisis intervention" at which time no suicidal or homicidal ideations were observed. *Id.* at pp. 27-29.   The chart reads "Cooper does not present with active Axis I symptomology and a referral to the psychiatrist is not warranted at this time. However, Axis II features are clearly evident."[25]   *Id.* at 29. Weber recommended follow-up as needed and that Cooper remain in his current housing status. *Id.*

Cooper continued to be monitored by medical staff.   On August 22, 2013, he reported that he was "alright." *Id.* at 30-31.   On August 23, 2013, Cooper drank three portions of Boost and was no longer considered to be on a hunger strike. *Id.* at 32.

On September 4, 2013, Weber updated Cooper's chart, writing,

 Writer received several (3) written correspondence from inmate which did not require a face-to-face interview. Inmate's issues focused on a custody issue and medical issue.  Additional follow up required and writer and the correspondence was forwarded to HU Manager Lt. Liken and Don W. Beeman, RN.  A copy of the correspondence was placed in the hard copy medical record.[26]

---

[23]  The record does not address whether these therapies were provided.

[24]   The reason  for the move is unstated.

[25]  The Diagnostic and Statistical Manual of Mental Disorders is the standard classification of mental disorders used by mental health professionals in the United States. Axis I clinical syndromes include depression, schizophrenia, and social phobia. Axis II disorders include developmental disorders and personality disorders. *See* http://allpsych.com/disorders/dsm/#.VeXPyH0vtCE.

[26]   The record provided to the court of Cooper's September 5, 2013, medical visit with Nurse Brown is illegible. (ECF 27-15, p. 35).

*Id*. at 34.

Weber updated the chart again on September 11, 2013, indicating written correspondence received from Cooper did not require a face-to-face interview.  *Id*. at 36.  On October 29, 2013, Weber indicated that he had received written correspondence from Cooper about a use of force incident on October 22, 2013, involving Cooper, and had discussed Cooper's concerns with Housing Unit Manager Lieutenant Gordon and Captain Butler.  *Id*. at 37.  Weber noted the correspondence received from Cooper did not require a personal interview.  *Id.*

On September 5, 2013, Cooper told Nurse Stratton Brown that he needed a single cell. *Id*. at 35.

On November 15, 2013, Jonathan Hess, a member of the psychology department, saw Cooper at a behavioral health segregation visit.  Hess noted Cooper was seen by the segregation review team on that date, and it was recommended that he be released from administrative segregation to complete his disciplinary segregation time. *Id*. at 37.  Hess wrote Cooper did not exhibit any evidence of a formal thought or mood disorder. *Id*.  Cooper's mental status exam ("MSE") was within normal limits. *Id.*

On November 20, 2013, Cooper requested a psychology consultation and was seen by Hess on December 13, 2013. *Id*. at 39-40.  Hess determined Cooper exhibited no suicidal or homicidal ideations and referral to a psychiatrist was unnecessary. He recommended that Cooper remain in his current housing status and receive follow-up as needed. *Id*. at 40.

On December 20, 2013, Weber met with Cooper.  The report reads:

> Met with inmate Cooper to follow-up on a staff referral to the Psychology Department. Inmate Cooper reports he was the focus of a use of force that occurred on October 22, 2013 in which he claims staff assaulted him and he has not received appropriate medial [sic] and mental health services. He reports that he is too old to be double celled with younger inmate [sic] and has medical

> conditions that make him a candidate for a single cell.  Inmate presents a [sic] loud, demanding, hostile, and assumes a victim role. Inmate began agitated, ended the interview prematurely and told this writer to "grow up" as he walked from the cell.

*Id*. at 41.

Weber concluded there was no change in Cooper's mental health status, and recommended that Cooper remain in his current housing status and follow up as needed.  No homicidal or suicidal ideations were noted and referral to a psychiatrist was deemed unwarranted. *Id*. at 42. In his declaration, Weber attests that at no time was Cooper denied mental health services at WCI. (ECF 27-16).

In regard to Cooper's claims based on his violation of inmate rules, defendants provide the following information.  On May 5, 2011, Cooper was found guilty of violating inmate rules #400 (disobeying a direct order), and #405 (any exhibition, demonstration, or conveyance of insolence, disrespect, or vulgar language), and received 60 days of disciplinary segregation for violation of rule #400, and received 60 days concurrent for violation of rule #405. (ECF 27-17). On December 15, 2011, Cooper was found guilty of violating inmate rule numbers #100 (disruptive activity), #104 (use of threatening language), and #405, and received 180 days of disciplinary segregation and a revocation of 120 days of good conduct credits for violating of rule #100, 180 days of disciplinary segregation concurrent for violating rule #104, and 45 days of disciplinary segregation concurrent for violating rule #405. (ECF 27-18). Michael Yates, a correctional case manager, attests there is no record of Cooper receiving infractions on December 15, 2011, February 13, 2012, or May 1, 2012. (ECF 27-19).[27]

---

[27]   Defendants state an adjustment hearing was held on December 15, 2011, but the infraction was written on November 3, 2011. (ECF 27-18, p. 2).  In the notice, Officer Gilpin wrote that on November 2, 2011, Cooper turned to another inmate and yelled "These motherfuckers think they can do what they want. Its [sic] about time the find out what the fuck is up." *Id*.  Cooper then looked at Gilpin and said "Gilpin you sprayed my ass over in one for no reason, don't think I forgot that shit.  Your fuckin ass will get whats [sic] commin [sic]" *Id*.  Gilpin indicated he

Cooper's claims regarding mail delivery are addressed in a declaration executed by Mary Jane Rose, an office clerk in the NBCI and WCI mailroom. (ECF 27-20). Rose attests all mail, both incoming and outgoing, that is received by the mailroom is processed in accordance with approved Department of Public Safety and Correctional Services ("DPSCS") policies and directives. Rose declares that at no time, to her knowledge, has Cooper's mail, including his legal mail, been withheld, delayed, or not processed, as long as the mail was in compliance and was consistent with approved policies and directives of the DPSCS. All legal mail is logged for record keeping purposes and forwarded to the proper housing unit for distribution to the inmates. A legal mail log is maintained by mailroom staff which documents the name and DOC identification number of the inmate to whom the mail is addressed, the name of the sender, the date the mail was received, and the signature of the inmate acknowledging receipt. No record pertaining to outgoing mail is maintained. Rose attests that to the best of her knowledge, no mailroom staff member has hindered delivery or stolen any mail belonging to Cooper, or any other inmate. Cooper's mail is received, dispensed, and handled like the mail of every other inmate housed at NBCI or WCI. *Id.*

## STANDARD OF REVIEW

The court is mindful that Cooper is a self-represented litigant, and his complaint is held to a less stringent standard than that drafted by an attorney. *See Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978) (discussing liberal construction of pro se pleadings). Federal courts are charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). The

---

interpreted these statements as a personal threat as well as a threat to institutional safety and security. *Id*. The record shows Cooper pleaded guilty before a hearing officer to violating rules 100, 104, and 405. *Id.* at 6. Officer Payne wrote a report on November 3, 2011, not an infraction notice, in which he indicated he heard Cooper make threatening remarks to Gilpin. *Id*. at 3.

requirement of liberal construction does not mean, however, that the court can ignore a clear failure in the pleading to allege facts which set forth a claim currently cognizable in a federal district court. *See Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 390–91 (4th Cir. 1990).

## I.      Motion to Dismiss

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir.1999). Except in certain specified cases, a plaintiff's complaint need only satisfy the "simplified pleading standard" of Rule 8(a), *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).   In order to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Generally, when ruling on a 12(b)(6) motion, the court assumes that the facts alleged in the complaint are true and draws all reasonable factual inferences in the nonmoving party's favor. *Edwards,* 178 F.3d at 244. A complaint need not provide "detailed factual allegations," but it must "provide the grounds of [the plaintiff's] entitlement to relief" with "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly,* 550 U.S. at 555(internal quotations omitted).

## II.     Motion for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure states a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).   A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby,*

*Inc.,* 477 U.S. 242, 248 (1986).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249.

In undertaking this inquiry, the court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Ricci v. DeStefano*, 557 U.S. 557 (2009); *Scott v. Harris,* 550 U.S. 372, 378 (2007).  The court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993).  If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson*, 477 U.S. at 249–50.  A party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio* Corp., 475 U.S. 574, 586 (1986); *see also In re Apex Express* Corp., 190 F.3d 624, 633 (4th Cir. 1999).

## DISCUSSION

Defendants seeks dismissal of Cooper's claims asserting a number of affirmative defenses and other grounds, including the statute of limitations, Cooper's failure to exhaust his administrative remedies, lack of personal participation by defendants, and failure to state a claim. Defendants assert there are no genuine issues of material fact at issue and they are entitled to summary judgment in their favor as a matter of law.  As noted, Cooper has not filed any verified exhibits or declarations to oppose defendants' dispositive motion.

I.      **Threshold Defenses**

### A.  Statute of Limitations

The statute of limitations applied in actions brought under 42 U.S.C. § 1983 is the statute of limitations for personal injury torts. *Wilson v. Garcia*, 471 U.S. 261, 266–69 (1985); *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 187 (4th Cir. 1999). In Maryland, the general three-year statute of limitations applies to these causes of action. Md. Code Ann., Cts. & Jud. Proc. § 5–101; *see also Nasim v. Warden, Maryland House of Correction*, 64 F.3d 951, 955 (4th Cir. 1995). Federal law governs the question of when a cause of action accrues under 42 U.S.C. § 1983. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007). Generally speaking, the running of the statute of limitations begins when a plaintiff knows or has reason to know of his injury. *Id.*

Here, a number of plaintiff's claims are barred by the applicable statute of limitations because plaintiff's complaint was filed in this court on December 23, 2013. (ECF 1). Consequently, the following claims are time-barred: 1) the Warden and Commissioner limited ARP claims on September 9, 2010 and January 1, 2010 (Claim One); 2) Mouldin denied him medical treatment on April 27, 2010 (Claim Four); 3) he was fondled by officers Adkins and Yutzy, denied of out-of-cell recreation on two occasions, and his cell light was purposely left on in August of 2010 (Claim Five); 4) Adkins denied him a meal tray and wrongfully confiscated his personal property on August 30, 2010 and September, 3, 2010, respectively (Claim Five); 5) defendants are responsible for the death of his inmate life partner sometime between September 13-23, 2010;[28] (Claim Six): and 6) mail claims beginning in September of 2010. (Claim Seven).[29]  Notably, Cooper fails to provide any reasons to excuse his belated and untimely filing as to the above claims.

---

[28]  Further, Cooper provides no documentary evidence that he has standing to raise a claim on his own behalf or that of the deceased.

[29]  As noted herein, a number of these claims, even if they had been timely filed, are dismissible on other grounds.

### B.  Exhaustion of Administrative Remedies

Defendants seek dismissal of claim Cooper's claim that WCI staff failed to protect him from harm by other inmates, asserting he has failed to exhaust his administrative remedies. The Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, et. seq., provides in pertinent part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

Cooper is subject to the strict requirements pertaining to exhaustion of remedies. The PLRA's exhaustion requirement "has been interpreted to require prisoners to pursue administrative grievances until they receive a final denial of their claim, appealing through all available stages in the administrative process." *Chase v. Peay*, 286 F.Supp.2d 523, 530 (D. Md. 2003), aff'd, 98 F. App'x 253 (4th Cir. 2004). If the appeal is unsuccessful, the prisoner must, within thirty days, file an appeal with the Executive Director of the Inmate Grievance Office ("IGO"). *Id.*  Of import here, "failure to exhaust is an affirmative defense under the PLRA." *Jones v. Bock*, 549 U.S. 199, 216, (2007). A claim that has not been exhausted may not be considered by this court. *Id.* at 220.

Administrative remedies must be available to the prisoner. This court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar–Avellaveda v. Terrell,* 478 F.3d 1223, 1225 (10th Cir. 2007).  The Fourth Circuit has addressed the meaning of "available" remedies:

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. *See id.* 478 F.3d at 1225; *Kaba v. Stepp,* 458 F.3d 678, 684 (7th Cir.2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. *See*

> *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies in accordance with the applicable procedural rules, so that prison officials have been given an opportunity to address the claims administratively. *Id.* at 87. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

*Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008).

The purpose of the exhaustion requirement is to: 1) allow a prison to address complaints about the program it administers before being subjected to suit; 2) reduce litigation to the extent complaints are satisfactorily resolved; and 3) prepare a useful record in the event of litigation. *Blake v Ross*, 787 F.3d 693, 698 (4th Cir. 2015), citing *Jones v. Bock*, 549 U.S. at 219 (2007). Because an inmate's failure to exhaust administrative remedies is an affirmative defense, defendants bear the burden of proving that Cooper had remedies available to him of which he failed to take advantage. *Id.*

As indicated, the PLRA's exhaustion requirement is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase*, 582 F.Supp.2d at 530. *See Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"). Thus, Cooper's claim must be dismissed, unless he can show that he has satisfied the administrative exhaustion requirement under the PLRA or that defendants have forfeited their right to raise non-exhaustion as a defense. *See Chase*, 286 at 528.[30]

---

[30] Maryland provides a three-step administrative grievance process for prisoners. The first step is the filing of a request for administrative remedy with the Warden of the institution (commonly referred to as an ARP). *Chase*, 286 F.Supp.2d at 529 n. 10. In the event the ARP is denied, the prisoner must, within ten days, file an appeal with the Commissioner of Correction. *Id.*, *see* Md. Code, Corr. Serv. Art. § 10–206 and Code of Maryland Regulations ("COMAR"), Title 12 § 07.01.03. Within thirty days after the completion of the ARP process, the inmate may request further review by submitting a complaint to the statewide Inmate Grievance Office ("IGO"). *See* COMAR 12.07.01.05.B.

Defendants argue the claim has not been exhausted because Cooper's IGO "appeal" of the denial of the ARP regarding the matter, was administratively dismissed for failure to properly exhaust his administrative remedies. (ECF 27-1, pp. 15-16).  Given that Cooper generally claims his attempts to access the ARP process have been hindered or improperly processed, the court shall in an abundance of caution deny dismissal of this claim based on failure to exhaust administrative remedies.

### C.  Respondeat Superior

In order for liability to exist under § 1983, there must be personal involvement by a defendant in the alleged violation. *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977); *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994); *see also Rizzo v. Goode*, 423 U.S. 362, 370-71 (1976). Vicarious liability based on respondeat superior is generally inapplicable to § 1983 actions.

In order to establish a claim for supervisory liability under § 1983, a claim must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw*, 13 F.3d at 799.

Cooper does not claim defendants Bishop, Shearin, Sowers, Watson, or Graham were personally involved in the matters alleged in his complaint. Further, he provides no facts to hold these officials culpable under a theory of supervisory responsibility.   Accordingly, these defendants will be dismissed from this action.

### D.  Failure to State a Claim

In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege a violation of a federal constitutional right or a right secured by federal law. *See Baker v. McCollan*, 443 U.S. 137, 140 (1979). Section 1983 establishes a cause of action against any "person" who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. However, § 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver,* 510 U.S. 266, 271 (1994) (quoting *Baker*, 443 U.S. at 144 n. 3).

Cooper claims that Officer Sellers called him a child molester and a snitch in front of other inmates. Similarly, he claims Officer Gilpin called him a snitch. Of import here, he does not claim the taunts caused him physical harm or contributed to the altercations with other inmates. The use of threats and slurs by corrections officers without more does not state a federal claim. *Collins v. Cundy*, 603 F.2d 825, 82 (10th Cir. 1979). "[N]ot all undesirable behavior by state actors is unconstitutional." *Pink v. Lester*, 52 F.3d 73, 75 (4th Cir. 1995). Mere verbal abuse and taunting inmates by guards, including aggravating language, does not state a constitutional claim. *See McBride v. Deer*, 240 F.3d 1287, 1291 n. 3 (10th Cir. 2001) (stating "acts or omissions resulting in an inmate being subjected to nothing more than threats and verbal taunts do not violate the Eighth Amendment"). Verbal harassment and aggravating language, without more, do not amount to a constitutional violation. *See Blades v. Schuetzle,* 302 F.3d 801, 805 (8th Cir. 2002) (racial slurs); *McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir. 1983); *Cole v. Cole*, 633 F.2d 1083, 1091 (4th Cir. 1980); *Johnson v. Glick*, 481 F.2d 1028 (2d Cir. 1973). Even if such taunts were actually made, Cooper does not allege that he actually suffered any

24

physical harm as a consequence of the purported comments. Cooper's conclusory and unsubstantiated assertions of harassment do not support a cognizable cause of action under §1983, and this claim shall be dismissed.

Cooper's claim of retaliation by Officer Manuel is similarly unavailing and subject to dismissal. In order to prevail on a claim of retaliation, a plaintiff must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right. *Adams v. Rice,* 40 F.3d 72, 75 (4th Cir. 1994). A complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone. *Gill v. Mooney*, 824 F.2d 192, 194 (2nd Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2nd Cir. 1983). Cooper claims that Officer Manuel ordered a urine test for him to retaliate against and to harass him, but does not identify any constitutionally protected conduct at issue. Absent the implication of a constitutionally protected right, this claim must be dismissed.

Cooper's claim that he was "assaulted" by Officer Sellers on July 31, 2011, when Sellers allegedly "snatched" a coffee cup from his hand is also insufficient. Cooper provides no facts in support of his claim nor premises his claim on a constitutional or federal cause of action. Cooper does not particularize the facts, suggest he was in any way harmed, nor claim the officer acted with malicious or deliberate intent. Consequently, this claim will be dismissed.

In Claim Eight, Cooper states that on May 1, 2012, while he was housed at NBCI, Lt. Pennington and Security Chief Arnold placed him on administrative segregation for exercising his right to free speech and to practice his religion. Cooper's allegation is completely devoid of any facts to support that stated causes of action. Cooper does not explain by what actions his rights to free speech and to practice his religion were implicated or caused in his placement on

administrative segregation. This claim fails to meet the minimum standards for setting forth a claim, and will be dismissed.[31]

Cooper's generally stated and unsupported claims that Officer Manual left on a cell light on one occasion, Officer Adkins left on a cell light after serving a notice of rule violation,[32] and Officer Gilpin "harassed" him by showing up at his cell after the incident with Brawley, are likewise bald and conclusory, fail to meet the minima for setting forth a claim, and will be dismissed.

## II.   Eighth Amendment Claims

### A.  Failure to Protect Claims

An inmate has an Eighth Amendment right to be protected from violence perpetrated by other prisoners. *Danser v. Stansberry*, 772 F.3d 340, 346 (4th Cir. 2014); *see Farmer v. Brennan*, 511 U.S. 825, 833-35 (1994). In *Danser*, the Fourth Circuit explained:

> An Eighth Amendment claim of this nature requires proof of two elements to establish deprivation of a constitutional right. [*Farmer*, 511 U.S.] at 834; *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010). First, a prisoner must establish a serious deprivation of his rights in the form of a "serious or significant physical or emotional injury."[ ] *Brown*, 612 F.3d at 723; *see also De'lonta v. Johnson*, 708 F.3d 520, 525 (4th Cir. 2013). . . . The second element … requires that a plaintiff show that the prison official allegedly violating the plaintiff's constitutional rights had a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 (citation and internal quotation marks omitted). In this context, the required state of mind that must be established is a "deliberate indifference to inmate health or safety." *Id.* (citations omitted).

*Danser,* 772 F.3d at 346.

---

[31]   Cooper's claim regarding his Lenten meals is addressed later in this memorandum.

[32]  Isolated instances of leaving on a cell light as are presented here do not suggest requisite deliberate indifference necessary to amount to an Eighth Amendment claim.

In order to prevail on an Eighth Amendment claim of failure to protect from violence, a plaintiff must establish that defendants exhibited deliberate or callous indifference to a specific known risk of harm. *See Pressly v. Hutto*, 816 F. 2d 977, 979 (4th Cir. 1987).  "Prison conditions may be restrictive and even harsh, but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penologicial objective, any more than it squares with evolving standards of decency.  Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer*, 511 U.S. at 833-34 (citations omitted).  "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837, *see also Rich v. Bruce*, 129 F. 3d 336, 339-40 (4th Cir. 1997).  However, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk, no matter how obvious." *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101, 105 (4th Cir. 1995); *see Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). And, "[a] prison official's subjective actual knowledge [of a risk] can be proven through circumstantial evidence...." *Makdessi*, *Id.*

Cooper alleges he was assaulted on three instances by other inmates. He claims on August 9, 2011, he was assaulted by Matthew Lewis.  Cooper claims on January 31, 2012, he was assaulted by Calvin Brawley, and on August 4, 2013, he was assaulted by Jules Williams and Donald White.

**1.  August 9, 2011**

As to Cooper's claim of an August 9, 2011 assault and statement to the nurse in that

regard, there is no evidence that the incident was reported to prison correctional staff.  As noted, defendants have submitted a declaration by case manager Randy Durst attesting he was unable to find a record of an assault against Cooper by another inmate on that date. Importantly, Cooper does not allege officers were aware Lewis was a danger to Lewis or his known enemy prior to the incident alleged.  He alleges only in a conclusory fashion that Officer Lambert and Captain Stotler "breached a duty to use due care and failed to protect him" from Lewis. (ECF 1-1, p. 16).

Prison officials cannot be found liable under the Eighth Amendment unless the official knows and disregards an excessive risk to inmate health or safety.  As there is no evidence corrections officers were aware of a harm posed to Cooper by Lewis, there is no genuine issue of material fact is dispute, and summary judgment will be entered in favor of defendants as to this claim.

### 2.  January 31, 2012

Similarly, Cooper claims that on January 31, 2012, Officer Beachy, Sergeant Leydig, Lieutenant Harbaugh,  and Captain Stotler "breached a duty to use due care and failed to protect" him from Calvin Brawley. (ECF 1-1, pp. 16-18).  Cooper provides no details to support his conclusory assertion of breach of duty.  Cooper also claims Haubaugh and Officer Lambert forced him into an unsafe environment when they placed him in a double cell after he refused double celling housing. (ECF 1-1 pp. 36-37).  Cooper does not state why he refused double cell housing or why he believed the cell constituted an unsafe environment.

Cooper's assertions are conclusory and are unsupported by facts suggesting the officers were aware the Brawley or any other inmate posed an excessive risk of harm to him and the officers failed to act to protect him. Thus, even when the facts are judged in the light most favorable to Cooper, no genuine issue of material fact is presented, and defendants are entitled to

summary judgment.

### 3.  August 4, 2013

Cooper does not allege that he alerted corrections officials or that corrections officer had reason to know that he was at risk of harm from his cell mate Jules Williams or inmate Donald White. Instead, he posts inmates Williams and White were able to assault him "because of policies and decisions made by the Director of Corrections and the Warden of Western Correctional Institution to double cell inmates and perform lock-in procedures without a correctional officer on the top and bottom tiers. (ECF 1-1, p. 19).

Cooper's conclusory allegations are insufficient. Indeed, as Cooper acknowledged to the the IIU interviewer, the altercation on August 4, 2013, was based on a disagreement  that had occurred just earlier that day. Cooper does not allege any facts suggesting that prison officials had reason to know and then disregarded that he faced an excessive risk of harm. Cooper does not allege that he brought concerns about his safety to the attention of guards, or that there were facts from which an inference of risk could be drawn. Absent such evidence, Cooper's failure to protect claims as to this incident is unavailing.  Further, defendants have submitted Lieutenant Carder's declaration which explains that two officers are stationed during lock-in to observe the procedure and have an unobstructed view of the tier.  (ECF 27-1).  Carder states that all inmates at WCI are placed double-celled unless a judicial or medical order requires single cell placement. *Id*.  Cooper was evaluated at WCI and it was determined he had no medical need for a single cell. Based on the undisputed evidence, Correctional Defendants are entitled to summary judgment in their favor.

### B.     Claim of  Inadequate Mental Health Treatment

Prisoners are entitled to receive reasonable treatment for serious medical needs. *See*

*Estelle v. Gamble*, 429 U.S. 97 (1976). Failure to provide treatment, when indicating a "deliberate indifference to serious medical needs of prisoners" results in "the 'unnecessary and wanton infliction of pain,' ... proscribed by the Eighth Amendment." *Id.* at 104. Deliberate indifference is shown by establishing that the defendant had actual knowledge or awareness of an obvious risk to a plaintiff's serious medical need and failed to take steps to abate that risk. See generally, *Farmer* 511 U.S. at 825; *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101 (4th Cir. 1995).

Prisoners also have an Eighth Amendment right to be free from deliberate indifference to their serious psychiatric needs. *See Comstock v. McCray*, 273 F.3d 693, 702 (6th Cir. 2001). There is no underlying distinction between the right to medical care for physical ills and its psychological and psychiatric counterpart. *See Bowring v. Goodwin*, 551 F.2d 44, 47 (4th Cir. 1977). An inmate is entitled to psychological or psychiatric treatment if a "[p]hysician or other health care provider, exercising ordinary skill and care at the time of the observation, concludes with reasonable certainty 1) that the prisoner's symptoms evidence a serious disease or injury; 2) that such disease or injury is curable or may be substantially alleviated; and 3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial." *Id.* The essential test is one of medical necessity and not simply that which may be considered merely desirable. *Id.* at 48. A court will not intervene upon allegations of mere negligence, mistake or difference of opinion.

### 1. Mental Health Treatment at NBCI

Cooper self-reports that he suffers from "battered person syndrome, post-traumatic stress syndrome, and paranoia while in a cell with other inmates." (ECF 1-1, p. 27). His self-reported conditions are not substantiated in the medical and mental health records provided to the court.

Cooper claims he was denied psychological treatment for these conditions: on October 31, 2011, February 17, 2012, and March 19, 2012 by Mrs. Warnyck, on November 16, 2011, by Bruce Liller, on December 21, 2011, by Laura Mouldin, and on January 6, 2012, by Mr. Banks.[33] Cooper's complaints appear to arise from the time he was housed at NBCI, and no mental health, medical records, or affidavits have been filed by defendants concerning the mental health treatment he received at NBCI during this period to refute these, albeit generally stated claims. Judging the facts in the light most favorable to Cooper, as this court is obliged, however, there is a genuine issue of material fact as to the mental health treatment Cooper received at NBCI, and summary judgment will be denied as to this claim subject to renewal within sixty days with verified exhibits and declarations.

### 2.  Mental Health Treatment at WCI

Cooper also asserts that between October 22, 2013 [34] and December 5, 2013, Ronald Weber deprived him of psychological treatment at WCI.  The record contradicts his claims.  On October 29, 2013, after receiving correspondence from Cooper regarding  the October 22, 2013, use of force incident, Weber discussed Cooper's concerns with Housing Unit Manager Lieutenant Gordon and Captain Butler.  *Id*. at 37.  Weber noted the correspondence received from Cooper did not require a personal interview. *Id.*  On November 15, 2013, Jonathan Hess saw Cooper at a behavioral health segregation visit.  Hess noted that plaintiff was seen by the segregation review team on that date, and it was recommended that he be released from administrative segregation to complete his disciplinary segregation time. *Id*. at 37.  Hess wrote Cooper did not exhibit any evidence of a formal thought or mood disorder. *Id.*  Cooper's mental

---

[33]   As earlier indicated, service was not obtain on Warnyck or Banks.  Both were members of the Psychology Department at NBCI.

[34]   The court notices that Cooper was involved in a use of force incident on October 22, 2013. *See Cooper v. Brinegar*, JFM-13-3692.

status exam ("MSE") was within normal limits. *Id*.  On November 20, 2013, Cooper requested a psychology consultation and was seen by Hess on December 13, 2013. *Id*. at 39-40.   On December 20, 2013, Weber met with Cooper to discuss the October 22, 2013, incident and evaluate his mental health status.   *Id*. at 41.Weber concluded there was no change in Cooper's mental health status, and recommended that Cooper remain in his current housing status and follow up as needed.  No homicidal or suicidal ideations were noted and referral to a psychiatrist was determined unwarranted. *Id*. at 42. Weber has filed an affidavit attesting that at no time was Cooper denied mental health services at WCI.  (ECF 27-16).   Cooper does not dispute these facts.  While Cooper may not agree with the mental health care he has received from Weber and other mental health providers at WCI, the record demonstrates he was seen for his complaints several times.  Cooper's disagreement  with Weber over the type of mental health evaluations he has received and Weber's recommendation that he remain in double cell housing, represents a difference of opinion, and does not amount to a claim of constitutional moment.  Accordingly, summary judgment will be entered in favor of defendants as to this claim.

## III.   First Amendment Claim

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend I.; *Cruz v. Beto*, 405 U.S. 319, 322 (1977).  To state a free exercise claim under this amendment, a plaintiff must allege facts sufficient to show (1) that he holds a sincere belief that is religious in nature, (2) that a prison regulation imposes a substantial burden on his right to free exercise of his religious belief, and (3) the regulation is not reasonably related to any legitimate penological interest. *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987).  "[L]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the

considerations underlying our penal system." *Id*. at 4348 (quoting *Price v. Johnston*, 334 U.S. 255, 285 (1948)).

With respect to the free exercise of religion, prison inmates retain a right to reasonable opportunities for free exercise of religious beliefs without concern for the possibility of punishment. *See Cruz*, 405 at 322. That retained right is not unfettered. Prison restrictions that impact the free exercise of religion but are related to legitimate penological objectives do not run afoul of the constitution. *See Turner v. Safley*, 482 U.S. 78, 89 (1987). The test to determine if the restrictions are justified requires examination of whether there is a rational relation between the asserted governmental interest and the regulation in question. *Id*. In addition, this court must examine whether there are alternative means of exercising the right asserted; whether accommodation of the right will impact on the orderly operations of the prison; and whether readily available alternatives to the regulation would be less restrictive. *Id*. at 90–91.

Another consideration is the Religious Land Use and Institutionalized Persons Act (RLUIPA).[35] "RLUIPA prohibits [state] prisons from imposing a substantial burden on an inmate's religious exercise unless prison officials can demonstrate that the burden furthers a compelling governmental interest by the least restrictive means." *Miles v. Moore*, 450 F. App'x 318, 319 (4th Cir .2011) (citing 42 U.S.C. § 2000cc–1(a)).

To survive summary judgment on his First Amendment and RLUIPA claims, Cooper must show that the DOC policy implicated his ability to exercise a practice "sincerely based on a religious belief." *Holt v. Hobbs*, ⸺ U.S. ⸺, 135 S.Ct. 853, 862 (2015) (RLUIPA); *O'Lone*, supra (First Amendment). He must also show that the challenged policy "substantially burdened" his religious exercise. *Id.; Hernandez v. Comm'r,* 490 U.S. 680, 699 (1989) (First Amendment).

---

[35] Cooper does not specifically implicate the First Amendment or RILUPA in his claim. As noted, the self-represented plaintiff's claims are accorded  liberal construction.

"[A] substantial burden on religious exercise occurs when a state or local government, through act or omission, 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)).

The DOC Religious Services Manual recognizes that Roman Catholics abstain from eating meat on Ash Wednesday and on all Fridays between Ash Wednesday and Good Friday as an observance of the Lenten season. (ECF 27-13). The manual states individuals make personal decisions regarding from what food they will abstain, and no special meal requirements or adjustments are therefore provided for Lent because it is a matter up to the inmate. *Id.* at 12 and 16. [36] Cooper provides no evidence to dispute the premise of policy set forth in the DOC manual. Neither does Cooper allege suffering any harm (e.g. weight loss, lack of vegetarian items on his meal tray) as result. Cooper fails to dispute defendants' stated reasons for the policy that individuals make personal decisions regarding from what food they will abstain, and no special meal requirements or adjustments are therefore provided for Lent because it is a matter up to the inmate. Thus, even when the facts are viewed in the light most favorable to Cooper, there is no genuine issue of material fact in dispute and defendants are entitled to summary judgment as to this claim.[37]

## IV.    Administrative Remedy Claim

Cooper's claim his administrative remedy requests were limited is unsupported. Moreover, he does not allege suffering any harm. While the long standing rule has been that

---

[36] In 2011, the Lent began on Wednesday, March 9, 2011, and in 2013, Lenten began on Wednesday, February 13, 2013. (ECF 27-14).

[37] Apart from naming Chaplain Lamp, Parrish Kammulf, dietary manager at WCI, and "the Director of Corrections" in setting forth this claim, Cooper does not allege specifically how these defendants personally participated in the provision of his Lenten meals, are responsible for the DOC policy at issue or deprived him of his religious meals. Nor does he provide a basis for conferring supervisory liability on these defendants. Accordingly, these defendants are also entitled to dismissal on this ground.

prisoners have no constitutional right to participate in an institutional grievance procedure, see *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994), with the passage of the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), the issue is somewhat less clear.   Assuming arguendo, however, that defendants did not satisfactorily investigate or respond to Cooper's remedy requests in a timely fashion, Cooper's claim fails as he has not alleged, much less demonstrated, any injury as a result of any failure to process his ARPs.   Further, Cooper fails to provide documentary evidence refuting ARP coordinator Jared Zais' declaration that Cooper's ARP was not improperly withheld or delayed.   Accordingly, defendants are entitled to summary judgment as to this claim as a matter of law.

## V.      Mail Claim

Prisoners have a constitutionally protected right of access to the courts. See Bounds v. Harris, 430 U.S. 817, 821 (1977). The right of access to the courts, however, is the right to bring to court a grievance, and violation of that right occurs only when an inmate is "hindered [in] his efforts to pursue a legal claim." *Lewis v. Casey*, 518 U.S. 343, 355 (1996).  To present a claim denial of access to the courts, the inmate cannot rely on conclusory allegations; he must identify with specificity an actual injury resulting from official conduct. *See Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996). "Ultimately, a prisoner wishing to establish an unconstitutional burden on his right of access to the courts must show 'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'" *O'Dell v. Netherland*, 112 F.3d 773, 776 (4th Cir. 1997) quoting *Lewis*, 518 U.S. at 355. "The requirement that an inmate alleging a violation of Bounds must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Id*. at 349.  Actual injury requires that the inmate demonstrate

that his "nonfrivolous" post-conviction or civil rights legal claim has been "frustrated" or "impeded." *Lewis*, 518 U.S. at 353–55.

Here, Cooper's claim is that beginning in 2010,[38] his outgoing legal mail was not reaching its destination, and he was not receiving some of his incoming personal and legal mail. Cooper fails to allege suffering any actual injury as a result of the mail concerns alleged, and thus fails to state a claim of constitutional moment. Further, Cooper fails to particularize how defendants Rose or Zais were involved. Rose attests that at no time to her knowledge has Cooper's mail been withheld or delayed, as long as it was in compliance with DPSCS policies and directives. She attests that to the best of her knowledge no mailroom staff has hindered delivery or stolen mail belonging to Cooper.  Under these circumstances, there is no genuine issue of material fact and defendants are entitled to summary judgment as a matter of law.

## VI.    Alleged False Reports

Cooper claims he was issued false infractions on May 4, 2011 and November 3, 2011. He provides no facts to support his conclusory claims in this regard.  "The act of filing false disciplinary charges does not itself violate a prisoner's constitutional rights." *Lewis v. Viton*, 07–3663, 2007 WL 2362587 *9 (D.N.J. Aug. 14, 2007) (citing *Freeman v. Rideout*, 808 F.2d 949, 962–53 (2d Cir. 1986)). There is no constitutional right to be free from being falsely accused. *See McClay v. Fowlkes*, 2008 WL 399263w7 *4 n. 6 (E.D.Va. Aug. 27, 2008) ("To the extent the plaintiff claims that he was falsely accused, he fails to state a § 1983 claim because '[t]he prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.") (internal citations omitted); *Anderson v. Green*, 2009 W.L. 2711885 *4 (D.Md. Aug. 24, 2009) (same); *Riggerman v. Ziegler,* 2012 WL 4119674 *5 (S.D.W.Va. Aug. 22, 2012) (inmates have no

---

[38]  As noted, this claim is also time-barred.

constitutional right prohibiting false charges against them).  Accordingly, defendants are entitled

to summary judgment in their favor as a matter of law as to this claim.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss, or in the alternative for

summary judgment (ECF 27) will be DENIED in part and GRANTED in part.  Summary

judgment will be DENIED as to Cooper's claim that he was denied adequate mental health care

at North Branch Correctional Institution, subject to renewal of the dispositive motion by

defendants within sixty days with verified exhibits and affidavits.  All remaining claims against

defendants are dismissed and summary judgment is entered in their favor.  A separate order

follows.


  September 4, 2015                                      _____/s/_____
Date                                                           J. Frederick Motz
                                                                United States District Judge